Good morning, Your Honors. My name is Sam Schwartz. I represent the appellant, Michael Racusin. Happy Friday. How do you say it again? Racusin. Michael Racusin. Racusin. Thank you very much. Racusin, I think is how you pronounce it. Okay, thank you. Happy Hawaii Day. Happy Friday to all of you. So, to start, I think in my mind, this case is a bit of a history lesson. And what I mean by that is this court has always held that Michael Racusin is or was and is a creditor of American Wagering. And that's been an issue in front of this court most of the time. And in the big picture, it's my opinion that if the court were to uphold Judge Zives' ruling at the Bankruptcy Court, where he changed the terms of the party's contract, he would effectively negate this court's prior rulings repeatedly that Michael Racusin was always a creditor of American Wagering. So all we're really talking about here is the gap period. Is that right? We're talking about the interpretation of the contract during the gap period, Your Honor. Yes. That's it. It's the gap period. Correct. Correct. So I think, Your Honor, let's talk about how that gap period was agreed to be held. And you can go all the way back to the plan. And I think you have to go all the way back to the plan, because if you look at Judge Goldwater's order, and Judge Goldwater entered the order confirming American Wagering's plan, AWI, he also entered the interpleader order that we focus on so much. And that interpleader order said the deal is preserved, while the interpleader order came into effect after the Bankruptcy Appellate Panel reversed the Bankruptcy Court and said Section 510B applied to Mr. Racusin's claim. He wasn't a creditor. He was an equity holder. They subordinated him. During that appeal, you have this tender of stock to the court. Mr. Racusin objected to that, saying, as a courtesy to American Wagering, we'll let you deposit that stock, but it doesn't count. You haven't performed. And Judge Goldwater, I think, really preserved that in his order, where he said, you haven't paid Racusin's claim while it's on appeal, and that in the event he wins that appeal to the Ninth Circuit, which he did, you have to pay him in accordance with the settlement agreement and the confirmed plan. Now, the part about the confirmed plan is important. And in looking back at prior arguments, I argued this a little bit of a different way. I would argue to the Bankruptcy Court and to the Bankruptcy Appellate Panel that what American Wagering negotiated for was this deal to pay Mr. Racusin in a certain way in exchange for a vote for the plan. So if you go back to the plan and you look at Section 5 of the plan, it says in the event Mr. Racusin wins both the Racusin appeal, which was the interest appeal that this Court found in his favor, and what the plan defines as the subordination appeal, Mr. Racusin gets paid in accordance with Sections 6 and 7 of the settlement agreement. Section 7 of the settlement agreement is the one we're arguing is the operative section that controls here that says Mr. Racusin gets $2.8 million in fees plus interest, or in damages, or he's owed $2.8 million plus interest. And that plan and those terms were subject to a final order, which was the confirmation order. Later, you have the ruling with the BAP. You then have this interpleader that's filed by American Wagering. You have the tender of stock. And then you have Judge Goldwater's order that preserves that plan and that confirmation order and the rights under the settlement agreement. So it's our view, at least, that interpleader order is critical because it preserves the party's rights and what they negotiated for and what Mike Racusin was told he would get in the plan and what he voted for. And I think when you talk about a vote for a plan, that's a critical provision. I'm typically a debtor's counsel. And in my mind, that's what you do. When you make a deal, you put it in the plan, you get somebody's vote. That's it. That's the end of the story. And I think in this particular case, what AWI is arguing now flies in the face of what they asked Michael Racusin to vote for and the deal they gave him, the expressed terms of the plan, which then is preserved later in the interpleader order. So if you then go forward to what the bankruptcy appellate panel said, if you look at their ruling, one of the things that they wrote was that the plan did not alter the party's rights under the settlement agreement. And I think that part was right, but they used it in a way to say that there's no conflict, and I think that's actually wrong. The plan says if Mr. Racusin wins, the Racusin appeal, which he won, and the subordination appeal that he won, he gets paid in accordance with Section 7 of the settlement agreement. What the bankruptcy court did and what the bankruptcy appellate panel did was say, no, Mr. Racusin doesn't get paid in accordance with Section 7. And the BAPF said, well, actually, the plan and the settlement agreement are in harmony there, and I would submit to this Court that it's not, actually, that those — that ruling actually pulled that part of the plan, which locked in the settlement agreement, pulled it all out, and basically said we don't really care what the plan says. We're going to make a new interpretation of the settlement agreement and then not pay interest during the gap period. So I think, Your Honor, to come to your point, yes, it's the gap period, and that's really what this case is about. And then where that goes is that the failure of American Wagering to pay interest, had they owed interest during that gap period, their failure to do so properly was a default under the contract. I think that's another issue that's in front of this Court that was also a mistake at the lower level, that one — Judge Zaheib initially found American Wagering didn't pay interest properly during the gap period, and then found their failure to pay interest during the gap period was actually a material default under the settlement agreement. He later changed his mind in a motion for reconsideration. We think that's in front of the Court as well, that if interest was due to Mr. Rackeson during the gap period, which we think it was, that the failure of AWI to pay during that period was a default. And that — that's a material part of this appeal as well. And what is the consequence of that? The consequence would be the change from 8 percent interest being owed to Mr. Rackeson to 12 percent interest all the way back to the beginning of the contract. So if we were to agree with you that we interpret Roman numeral 378, et cetera, to encompass interest during the gap period, is it your view that we would then have to make a determination on default, or would that be remanded? I think, Your Honor, that's a closer call. I think that the — that's one of the issues that we raised on appeal, that the failure to pay interest properly during the gap period gave rise to a default. I think this Court could find that. I think there's also a basis to remand for Judge Zive to look at it again. But it is an issue that we raised, and we raised it in part because there was a default found, and then Judge Zive reconsidered himself. What about the equity issue here? I think, Your Honor — Dovetailing on what Judge McKeown just said, is this something that's better addressed by the district court, bankruptcy court? Your Honor, I think it's something that is also in front of this Court as well. Well, it is. But, I mean, if, as Judge McKeown suggests, that we agree with you, is that something that should be just decided here, or is that something that should go back to the bankruptcy court? I think that's something that can be decided here. I think it's properly in front of you. I think I would understand if the Court were to say, I think you want further factual findings that need to occur at the trial court level. I can understand that. But I think that's properly in front of you to say, well, AWI always held out that it owed money to Rackison. It always acted as if interest was owed during the gap period. It actually paid interest during the gap period until later when it decided it misinterpreted its own contract. I think those equitable bases to say, Mr. Rackison was owed money in this period of time. And so that detrimental reliance that we raise in the papers is something that's going to... Let me ask you about the default as opposed to whether the interest was due. When the stock is deposited, things are still up in the air. Is that fair to say? They're still on appeal to this Court. It must be resolved. Right. So nobody knows what the answer is to this little, you know, Venn diagram. Yes. So you're not suggesting at that point they're in default, are you? No, Your Honor. So at what point in your view would they have been in default? Well, no, Your Honor. For instance, I'd like to reserve a couple, three minutes before the rebuttal. Yes. So when the Ninth Circuit then overturns the BAP on the subordination appeal and says, no, no, no, Mr. Rackison was always a creditor, send it back down for that ruling, American Wagering files a new unilateral amortization schedule. Right. Right. That's their 70-67. 70-67 schedule, correct. And then in that schedule it had a series of payments, including a $255,000 payment that American Wagering at this point, now they're paying interest in the gap period, they're catching up. They have a catch-up payment of $255,000. They decide not to make the $255,000 catch-up payment and they say, whoop, no, we're going to pay a different number, which was $30-some-thousand, I forget the exact amount at the moment. And then at that point proceed to go forward making payments. And at that point, that's when Mr. Rackison brought his action for summary judgment to say, here's a material default, and Judge Zia initially agreed with that. That's the default we're talking about, Your Honor. Among several, there's one they didn't pay interest at the beginning of the transaction when they were supposed to. They missed payments early on. The filing of the 70-67 amortization schedule, their own unilateral schedule of how to pay was different than the one in the contract. The parties had agreed to. They had no authority and no consent. You want to reserve your time? You've said enough to convince me that, I don't know about my colleagues, but if there – if we determine gap interest in your favor, it seems like there's too many moving parts for us to make a default determination on appeal. Well, understood, Your Honor. One more point I'd like to make, and I'll save you three minutes. Sure. The interpleader order, I think what's important for this Court to find, is that the interpleader order was law of the case, and that Judge Zia's decision to change that ruling was done too lightly. There was no new evidence in front of him. There was no change of law. There were no unusual circumstances that gave rise to changing that order, and that the parties had already agreed what would happen while the bankruptcy court. And so I think on that level, that's an important component here. The parties had already agreed on a process, had already fought over the issue, had come to an order, and later then, several years later, that order is changed in a way that materially alters the outcome. I think that was going too far, and I'll reserve my time. Thank you. Good morning, Manifest Court. My name is Thomas Fell, and I represent American Wagering. Your Honors, this case, as you have correctly identified, really comes down to one issue, and the one issue is the interpretation of the contract. The interpretation of the contract that Judge Zia ruled upon after very thoughtful and considerate review of not only the contract itself, but all the events that took place leading up to it, and subsequent thereto. And in particular, the one primary focus came down to that definition, the BAP appeal. And why was that so important? That was important because the settlement agreement provided for four and only four outcomes. And those four outcomes were dependent upon the two appeals that were then pending. As the BAP correctly pointed out in its decision, when you refer to pending appeals, that means appeals that have yet to be decided, not appeals that have yet to be filed. So Judge Zia found that of the four outcomes, with the BAP appeal having been decided shortly after the confirmation of AWI's plan, that the tender of stock of the 250,000 shares was in compliance with the settlement agreement. At that point in time, when the BAP's judgment came down, AWI had one obligation and one obligation only, and it had to perform. It was required under the contract and the plan to tender the 250,000 shares to Mr. Rackeson. Now, of course, as you all know from the papers before you, there was a problem with that. There were competing claims to Mr. Rackeson's claim. Various proportions had been assigned. There were various liens asserted. There, in fact, was a Federal District Court order that granted Mr. Hartoonian a first position, and he placed demands upon AWI, saying, don't pay anyone until you pay me. What was AWI to do? It was required to perform. The BAP judgment was not stayed at any time. AWI sought the interpleader action for the sole purpose of effectuating performance under both the settlement agreement and the plan, and by effectuating performance, it fully and completely satisfied its obligations as stated in the contract and as found by Judge Zive. The fact that subsequent events changed that as far as how the interpleader progressed. The interpleader normally would have just progressed. The parties would have asserted their claims. AWI would have been discharged. But as we know, Mr. Rackeson sought not a stay of the judgment, but a stay of the interpleader action. And when you look at the full transcript of the interpleader order, not just taking bits and pieces, but when you look at the transcript, you see the discussion that we're having in court. You see how Judge Goldwater is trying to determine how to deal with this. He recognized that Mr. Rackeson did file an appeal to this court. He recognized that there was a problem. There was no stay. And without a stay of the underlying BAP judgment, obviously there's a concern there. If there's performance, could the appeal to this court have been mooted? Good question. It was never brought up. It was never presented to this court. And why not? Judge Goldwater wanted to make sure that no matter what happened, Mr. Rackeson would ultimately get whatever he was entitled to. Fair enough. And as a result, you see how he works that in and tries to accomplish that. And in fact, we all agree on the record, okay, we get the deposit stock. He says we fully performed, we've done what we're supposed to do, and we did. But in the event that the Ninth Circuit reversed the BAP's decision, then the stock would be returned and we'd perform pursuant to the payment terms under the settlement agreement, all fine and dandy. But again, at that point in time, we had done everything required. But interest isn't meant to be punitive. It's not a sanction for having not been in compliance. It reflects time value of money. And if ultimately the judgment, when the dust settles, is that he was owed money and he didn't have the money during that time, why isn't he entitled to interest for the time value of that money that he didn't have? Your Honor, the only reason why he did not have in his possession the — what he was entitled to at that point in time was not — Why isn't he entitled to the value of that money that he didn't have? Because what he was entitled to before the Ninth Circuit ruled was stock, and he was tendered that stock. No different than — Let me give you — let me jump to an entirely different case, contract case. The plaintiff in the contract case, breach of contract case, loses in the district court the summary judgment, however they lose. Go to appeal, and the court of appeals contract case or in a State case, State supreme court says, no, you win, you're entitled to your $50,000. Now, when he puts in a claim for prejudgment interest, the defendant can't say, well, I won the first time around, so I don't owe you any interest until the supreme court finally spoke. No, you're entitled to interest going back to the — to the breach. Now, why doesn't that apply here? Because that's a prejudgment interest issue, which is different than full performance under the contract as interpreted by the court. And, in fact, the tender was made. Once the tender is made, then — Well, a tender of shares. But ultimately, the court says he's entitled to cash, not shares. But the shares had, in fact, we not had the problem with the interpreter because of the conflicting claims. The shares could have been immediately converted to cash. But not as much. Not as much as he was ultimately entitled to. And he wouldn't have converted them because he still wanted the larger amount of cash. So he would have just let those shares sit on the shelf so he could tender them back, or at least in theory he could have done that. We don't know. We don't know. But he wasn't given that option. You didn't go to him and say, well, you just take the shares. You didn't go, your client didn't go to him and say, well, you take the shares in full satisfaction. Absolutely. But we had competing claims. Well, but see, you talk about through no fault. That's true. We're not really assessing fault. The tender was a partial tender, in fact, although fairly or arguably close. But it wasn't a full amount at that time. Well, at the time, under the judgment from the lower court, it was a full tender. It was a full tender of what existed at the time. Again, the key being there was no stay of that judgment. We had to perform and we did perform. And it was a full performance. Had a stay. What would a stay of that judgment have accomplished? Presumably, then, there wouldn't have been any performance because it would have been stayed. And then we could go back to the arguments of what would have been due ultimately at a later time. But that didn't occur. And, of course, to obtain that stay, what would have been required? We don't know because that was never brought before a court. How was your client disadvantaged by putting the stock into the interpleader or issuing the stock at all? That was the value of the company. And that was all undone when the stock went back. Correct. So what injury did the company suffer in the meantime? While the stock was issued, it diluted the value of the shares of the company to the balance of the shareholders of the company. The company wasn't injured at all. How was the company disadvantaged by posting the stock? Again, other than changing. And how was Mr. Rackeson advantaged by it? Well, it's not so much an advantage to Mr. Rackeson. It was whether or not the company fully performed. The fact of the matter is that my concept is very different. I go back to my analogy. The company can't say just because that's all I'm required to do during this time that that's all I'm ever required to do, because ultimately it was required to do more. And just as if the trial court makes a decision which the Supreme Court reverses, what's happening in the interim? This isn't punishment for not having complied with a court order. This is trying to come to grips with the time value of money that he didn't have. I understand. The settlement agreement, though, provided for a payment plan over a period of time. A payment plan that included interest. That included interest over that period of time. That period of time was triggered when this Court reversed the battle. So when that was triggered, that is then when the company commenced payment under a – it was less than five years, but a four-and-a-half or five-year payment plan. And that trigger is when the company commenced payments, it commenced paying the interest, it has paid it in full as we stand here today. But that may be when it was going to start paying the cash, but that doesn't necessarily fix the amount that it's owed. And although I don't think it's dispositive, I do find it somewhat illuminating that on the 7067 schedule that the interest was included. Do you have a comment on that? Again, Your Honor, there's a – unfortunately, there were numerous things that were wrong with the amortization schedules as originally proposed. And I think you're all aware of that based on your review of the record. Right. You know, we had a miscalculation of the starting balance. Obviously, the starting date was not determined at the time the agreement was entered into. All that was triggered by subsequent events and as well as the ultimate interest calculations that were performed. The parties just didn't get it right. And it took, eventually, Judge Zive to carefully review the record and determine what each of those points and amounts should be. And he did that. What about this issue, as suggested by counsel, that if we agree that we – what would happen is you would go back to the very inception and tack on 12 percent interest? To do that, you would have to find – That's a huge difference. It is a huge difference. And to do that, you would have to find a material default. I submit to Your Honor that a finding of a material default under the settlement agreement is an issue of fact that should be handled by the trier of fact. I don't think that would – Yeah. So that, if we agreed, you would agree that that should go back to Judge Zive. Absolutely. Absolutely. Because, again, the calculations, as they were finally determined by Judge Zive, the starting point, the starting amounts and the like, have a dramatic impact on what the interest approvals are. So to determine whether or not there was a material default at any given time, and to be clear, to be clear, no – at no time did Mr. Rackeson or any other party during the gap period particularly assert that there was a default or otherwise make a demand on the company for any money. Now, subsequent to the issuance of this Court's order reversing the BAP when AWI commenced payment into the court registry, it was that following May when Mr. Rackeson did make the assertion that there was a default. That was the first written notice of an alleged default of AWI. Again, I think that issue would ultimately, once everything is recalculated now with the correct numbers and the correct starting point, would be an issue for the trial court to make a determination whether or not there was a material default. And, of course, I dispute that. We understand that you would. That there would have been. Right. You wouldn't get there. You wouldn't get there. I think the other thing that's important to remember, not only did Judge Zive not make this determination based upon his contract interpretation and contract law, but he also made his findings based upon equity. And he certainly felt that given the circumstances of the case and what the company had done to perform, that as a matter of equity, interest should not have been accruing during that gap period. So it's not just a matter of disagreeing with the contract interpretation, but I think, Your Honors, you have to review his ruling on the equitable issue, the point of use of discretion, and whether or not he abuses discretion in making those findings. Again, I think the comment that was made earlier about weren't these issues better determined at the trial court level, I agree with. And that's what Judge Zive did. This has been a long- But the reason is, let me see if I understand this. The reason, in part, the stock was deposited is because then you have the lawyers hanging out there with another claim, right? And your company just basically wants to say, you know, not me. And that's what an interpleader is. Right. Exactly. Right. But that, so I understand that, and that, of course, is why interpleader is available, because it sort of lets you minorly wash your hands. But it doesn't ultimately tell you how much you owe. I mean, I'm not quite sure why that gives you the edge in equity necessarily here. It doesn't tell me how much is owed. You are correct. I agree with that statement. All right. What it does is that the whole point of interpleader, you're right, is to say we don't have a claim to this. They all do. Here it is. We need to be done. And that's what we attempted to do. The fact that because of a later ruling by the Court which determined rather than stock, Mr. Rackerson's entitled to money, all it meant was then fine, we take the stock back and we deposit the money, which is exactly what we did. Again, from the standpoint of interpleader, we performed, we're done. And we performed fully. Now, most of that money, of course, has already now been dispersed as well. Now we're here after full performance and the disbursement of the money, and now Mr. Rackerson is requesting interest, additional interest, plus default interest. Frankly, Your Honors, it's time for this case to be over. We've performed. Well, have you tried to settle it? I don't think that's an appropriate thing to say. Well, maybe I should say it a different way. Have you gone to the mediators of the Ninth Circuit? We did not. Okay. That's all. Your Honors, unless you have any other questions, looks like my time is about up. I think not. Thank you. Thank you. You have a few minutes for rebuttal. I think the Court hit one of our nails in that the rule of deposit is not something that can be used to change the terms of a contract. And essentially, how I interpret what American Wagering to be doing is that they're arguing, well, we put the stock into the Court's registry through the interpleader. Therefore, because we fully performed, we can effectively change the terms of the contract. And they agreed in their reply brief that Rule 67 cannot be used to change the terms of a contract. And that's essentially what's being done here. And that's what Judge Zive did when I was in court and asked him what he was doing. I said, okay, so, Your Honor, you're just basically taking interest in the gap period, as we call it, and you're pulling it out of the amortization schedule even though the parties agreed this is how Mr. Rackeson would be paid if he won the subordination appeal before this Court. And Judge Zive said, yes, I'm going to basically reinterpret the contract despite all the actions of the parties. And that's what we're submitting to this Court should not be allowed, that we've provided you with a law that you can contract around these results. And that's our position. The parties contracted around the result that's in front of you right now. And that American Wagering would argue that Mr. Rackeson didn't object to the 70-67 amortization schedule. That's actually not true. Mr. Rackeson, representing himself at the time, appeared when that 70-67 amortization schedule was filed. Judge Zive essentially told him it's close enough, it's payments, let's just move on, is what Mr. A.W.I. suggested to them, and let's just be done. So Mr. Rackeson walked away and said, fine. It's later when A.W.I. says, well, I know we put this new schedule, we said we'd pay you $255,000, but we decided we're going to pay you $37,000. So at that point, that's where this new fight starts. And that's where then Judge Zive says, oh, you guys are really in the fall for failing to make that payment. And that's when then Judge Zive later decides to reconsider himself. So I think the moral of that story is that the parties always acted like interest was owed during the gap, and to allow the parties to, or at least A.W.I., to reinterpret the contract now shouldn't be allowed, especially considering the rulings of this Court in the past that Mr. Rackeson was always a creditor of this particular estate. So I think to come full circle, at least the comment that I've said to the lower courts, is that this deal was structured in a way to get Mr. Rackeson's vote for a plan. And as this Court may know, Chapter 11 bankruptcies, the vast majority of them fail. So debtors make deals to get votes. And in this case, if you go back to the plan, the plan says if Mr. Rackeson won these two appeals, he gets paid in accordance with paragraph 7 of the settlement agreement. Judge Goldwater, who entered the confirmation order, which was final, puts an interpleader order, that interpleader we call it the stay order, effectively saying in the transcript, you haven't paid Mr. Rackeson's claim while it's on appeal, and that if he wins on appeal, you have to pay him in accordance with the amortization schedules in the settlement agreement. That's the deal. That's what the party signed up for. And that's what we're asking this Court to help us stand upon and to rule in our favor. Thank you. The case just argued. Rackeson v. The American Wage Hearing is submitted. I do thank you both for very thoughtful arguments. Yeah, I enjoyed the argument. Thank you. Very well done.
judges: Ezra, McKEOWN, CLIFTON